**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CHRISTOPHER J. DESAVAGE | ) |
| | )     Civil Action No. 08 - 92 |
| | ) |
| Petitioner, | ) |
| | )     Magistrate Judge Lisa Pupo Lenihan |
| v. | ) |
| | ) |
| SUPERINTENDENT LAWLER; ATTORNEY | ) |
| GENERAL OF THE STATE OF | ) |
| PENNSYLVANIA DISTRICT ATTORNEY | ) |
| OF THE COUNTY OF ALLEGHENY | ) |
| | ) |
| Respondents. | ) |

## MEMORANDUM OPINION AND ORDER

Petitioner, Christopher J. DeSavage, a state prisoner incarcerated at the State Correctional Institution at Huntingdon, Pennsylvania, has petitioned for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons that follow, the Petition will be denied.

### A. Relevant Factual and Procedural History

The facts, as set forth by the Trial Court (doc. no. 17-2, pp. 13-14), are as follows.

(The following occurred after a night of drinking involving a number of teens, including Jamie Kraft, Christopher Desavage and Dale Holmes).

> DeSavage and Ms. Kraft were sitting in the car when DeSavage started to grope and kiss Ms. Kraft. Although she had been out with him on one other occasion, she did not want to engage in this type of behavior and asked DeSavage to stop. Initially he complied with her request; however, he again attempted to fondle her and also to kiss her. At this point, Ms. Kraft left the car, only to be confronted by DeSavage when he punched and then kicked her in the face. Holmes then came over and told DeSavage to stop and that he could not believe that DeSavage would hit her. At this point DeSavage picked her up

and put her in the car and, after threatening her with a gun, told her to take off her pants.  Initially she refused and DeSavage then took her pants off and engaged in vaginal intercourse even though she was having her period and had a sanitary napkin in place. After DeSavage raped her, he then pulled her out of the car. threw her across the hood of the car and proceeded to penetrate her anally.  Holmes was sitting in the back seat watching all of this and he did nothing.  When DeSavage was finished sodomizing her, he took Ms. Kraft and threw her into the back seat of the car and told Holmes to "do her".  Holmes whispered to Ms. Kraft that he was not going to rape her but, rather they should move and make sounds as though they were having intercourse. Ms. Kraft did as she was told by Holmes.  When they had finished, DeSavage once again grabbed Ms. Kraft and forced her to perform oral sex on him.  DeSavage then ordered her to perform oral sex on Holmes and watched her do so when Holmes was then sitting in the front seat.  Ms. Kraft was forced to perform oral sex on DeSavage a number of times over the next several hours and Holmes observed all of these sexual assaults.

At approximately 6:30 a.m. on May 9, 1998. Ms. Kraft finally persuaded Holmes and DeSavage to take her home.  DeSavage turned off Ohio River Boulevard onto the McKees Rocks Bridge and halfway across that bridge, stopped his vehicle and told Ms. Kraft to get out of the car.  Ms. Kraft asked in which direction was the City of Pittsburgh and Holmes pointed to that direction.  While she was walking toward the City of Pittsburgh, DeSavage got out of the Car, ran up behind her, grabbed her, picked her up and threw her over the railing on that bridge. Ms. Kraft was able to grab ahold of the railing and was trying to lift herself up when DeSavage grabbed her leg and then pushed it off, thereby causing her to fall one hundred and twenty-five feet into the Ohio River.   Ms. Kraft floated down the Ohio River approximately one-half mile before she washed up on shore and was seen by a security guard.  DeSavage then got into his car, drove to his cousin's house and

2

told her and her girlfriend, Kimberly Ngubash, that he had just thrown a girl off of the McKees Rocks Bridge because she did not give good head.  Holmes accompanied DeSavage to this residence and both of these young ladies indicated that while DeSavage and Holmes were extremely drunk, neither one appeared to be remorseful or concerned about their activities and, in fact, laughed about what had transpired.  Holmes, in fact, added that the victim gave good head.

During the subsequent investigation into the assault on Ms. Kraft, Holmes was interviewed and recounted the assault on Ms. Kraft by DeSavage.  In addition to this information, the Commonwealth also produced evidence from a rape screening kit and the subsequent DNA analysis performed which clearly indicated that DeSavage had oral, vaginal and anal intercourse with the victim.

Trial Court Opinion, 3/19/03 (doc. no. 17-2, pp. 11-15).

Petitioner was charged with two counts each of Rape and Involuntary Deviate Sexual Intercourse (IDSI), and one count each of Aggravated Assault, Terroristic Threats, and Criminal Conspiracy at CC No. 9806984.  In addition, Petitioner was charged at CC No. 9807078 with one count each of Criminal Attempt (homicide) and Aggravated Assault.  Co-defendant Dale Holmes was also charged with all of these crimes, except terroristic threats.  Petitioner was represented by John Knorr, Esq. during the December 9, 1998, non-jury trial before the Honorable David R. Cashman.  At the close of the trial, Petitioner was found guilty of all charges.  On February 16, 1999, Petitioner received an aggregate term of imprisonment of from 67½ to 135 years.  On February 18, 1999, Petitioner filed a *pro se* Motion for Modification/Reduction of Sentence and retained new counsel, Joseph Hudak, Esq., to represent him.  On July 7, 1999, Petitioner's post-sentence motion was denied by operation of law.

3

On July 5, 2000, Petitioner filed a *pro se* PCRA petition in which he claimed that Attorney Hudak had not filed the direct appeal he had requested. The court appointed Thomas N. Farrell, Esq., to represent Petitioner, and he filed an amended petition on June 4, 2002. Following a hearing, and by Order dated September 17, 2002, the Court reinstated Petitioner's appellate rights. On September 27, 2002, Petitioner, through Attorney Farrell, filed a Notice of Appeal to the Superior Court of Pennsylvania. On March 19, 2003, the Trial Court filed its Opinion (doc. no. 17-2). On February 24, 2004, Superior Court issued a Memorandum Opinion affirming the judgment of sentence (doc. no. 17-3, pp. 10-21). On March 24, 2004, Petitioner, through counsel, filed a timely Petition for Allowance of Appeal (PAA), which was denied by that Court on June 24, 2004.

On February 11, 2005, Petitioner filed a *pro se* petition pursuant to the Post-Conviction Relief Act (PCRA). On March 15, 2005, Patrick Nightingale, Esq. was appointed to represent Petitioner in his PCRA proceedings. The PCRA Court conducted evidentiary hearings on May 10, July 24, and August 1, 2006 and on August 8, 2006, it issued an Order denying PCRA relief. Petitioner filed a Notice of Appeal to the Superior Court of Pennsylvania and on January 23, 2007, the PCRA Court filed its Opinion denying relief (doc. no. 17-5, pp. 7-16) . On September 11, 2007, the Superior Court of Pennsylvania issued its Memorandum Opinion affirming the Order of the PCRA Court (doc. no. 17-5, pp. 61-66).

On January 16, 2008, Petitioner filed the instant *pro se* Petition for Writ of Habeas Corpus. On March 18, 2008, Petitioner filed an additional Petition for Writ of Habeas Corpus (doc. no. 6) wherein he raises the following claims for relief.

> 1. Trial Court abused it's discretion by denying petitioners request for substitute counsel, Trial Court denied petitioner's Sixth Amendment right to counsel.

4

2.     Trial Counsel ineffective for failing to withdrawl [sic] as counsel when there was a clear irreconcilable conflicting interests between counsel and petitioner, therefor petitioner was denied his Sixth Amendment right to counsel.

3.     Trial Counsel was ineffective for failing to move to sever petitioner's case from co-defendant's Dale Holmes case where petitioner's defense was irreconcilable with that of his co-defendant's, violation of Sixth Amendment right to confrontation clause, counsel was awair [sic] Commonwealth would entroduce [sic] into evidence co-defendants audio confession.

4.     Sentencing judge abused his discretion.

## B. Exhaustion Requirement and Procedural Default

The provisions of the federal habeas corpus statute at 28 U.S.C. § 2254(b) require a state prisoner to exhaust available state court remedies before seeking federal habeas corpus relief. Exhaustion is not a jurisdictional limitation, however, and federal courts may review the merits of a state petitioner's claims prior to exhaustion when no appropriate state remedy exists. Christy v. Horn, 115 F.3d 201, 206 (3d Cir. 1997).

Beyond questions of exhaustion, a federal court may be precluded from reviewing claims under the "procedural default doctrine." Gray v. Netherland, 518 U.S. 152 (1996). This doctrine dictates that federal courts will not review a state court decision involving a question of federal law if the state court decision is based on state law that is "independent" of the federal question and "adequate" to support the judgment. Coleman v. Thompson, 501 U.S. at 750.

Petitioner raised the majority of his claims on direct appeal and in his PCRA proceeding. Under the present circumstances, however, the Court need not determine whether the

claims have been procedurally defaulted. Under 28 U.S.C. § 2254(b)(2), "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." There is some disagreement among federal courts concerning whether § 2254(b)(2) applies solely with respect to the statutory exhaustion requirement, or whether it also applies in the procedural default context. Perruquet v. Briley, 390 F.3d 505, 515-516 (7th Cir. 2004) (collecting cases). Nevertheless, the Court of Appeals for the Third Circuit has applied § 2254(b)(2) in situations involving procedural default. Bronshtein v. Horn, 404 F.3d 700, 728 (3d Cir. 2005); Hameen v. Delaware, 212 F.3d 226, 251-252 (3d Cir. 2000). Other courts within this circuit have done likewise. Carter v. Carroll, 479 F.Supp.2d 432, 438, n. 4 (D. Del. 2007). Because it is clear that Petitioner has not demonstrated that he is entitled to federal habeas corpus relief with respect to any of his claims, this court need not undertake the lengthy analysis of state law that would be required to determine the applicability of the procedural default doctrine with respect to each claim. *See* Lines v. Larkin, 208 F.3d 153, 165 (3d Cir. 2000) (noting that "federal courts should be most cautious before reaching a conclusion dependent upon an intricate analysis of state law that a claim is procedurally barred."). Accordingly, this court will review Petitioner's claims under the authority set forth in 28 U.S.C. § 2254(b)(2).

### C. Standard of Review

In describing the role of federal habeas proceedings, the Supreme Court of the United States, in Barefoot v. Estelle, 463 U.S. 880, 887 (1983), noted:

> [I]t must be remembered that direct appeal is the primary avenue for review of a conviction or sentence.... The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate state trials.

In 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1214, April 24, 1996, (AEDPA), which further "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002).

Amended Section 2254 of the federal habeas corpus statute provides the standard of review for federal court review of state court criminal determinations and provides, in relevant part, as follows:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

28 U.S.C.§ 2254(d).

"A state-court decision is 'contrary to' clearly established federal law if the state court (1) 'contradicts the governing law set forth in [the Supreme] Court's cases' or (2) 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a [different] result.' " Williams v. Taylor, 529 U.S. 362, 405-6 (2000).  Few state court decisions will be "contrary to" Supreme Court precedent.

The federal habeas court more often must determine whether the state court adjudication was an "unreasonable application" of Supreme Court precedent. "A state-court decision 'involves an unreasonable application' of clearly established federal law if the state court (1) 'identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular ... case'; or (2) 'unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.' " Williams, 529 U.S. at 407. Thus, it is not enough to convince a federal court that in its independent judgment the state court applied the law incorrectly, a petitioner bears the burden of showing that the state courts applied the law in an "objectively unreasonable manner." *Accord* Bell v. Cone, 535 U.S. 685, 698-699 (2002).

In addition, a federal court must accord a presumption of correctness to a state court's factual findings, which a petitioner can rebut only by clear and convincing evidence. 28 U.S.C. § 2254(e). Where a state court's factual findings are not made explicit, a federal court's "duty is to begin with the [state] court's legal conclusion and reason backward to the factual premises that, as a matter of reason and logic, must have undergirded it." Campbell v. Vaughn, 209 F.3d 280, 289 (3d Cir. 2000). In determining what implicit factual findings a state court made in reaching a conclusion, a federal court must infer that the state court applied federal law correctly. *Id.* (citing Marshall v. Lonberger, 459 U.S. 422, 433 (1982)). Where the state court fails to adjudicate or address the merits of a petitioner's claims, the federal habeas court must conduct a *de novo* review over pure legal questions and mixed questions of law and fact. Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001).

Petitioner's claims will be reviewed in accordance with the standards set forth above.

8

### D. Trial Court Error

In his first claim, Petitioner asserts that the trial court erred by denying his request for substitute counsel thereby denying his Sixth Amendment right to counsel. The Sixth Amendment provides as follows:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor; and to have the Assistance of Counsel for his defense.

U.S. Const. amend. VI.

The Sixth Amendment right to counsel in a criminal proceeding is a fundamental right.[1] This guarantee of effective assistance encompasses "the right to adequate representation by an attorney of reasonable competence and the right to the attorney's undivided loyalty free of conflict of interest." United States v. Gambino, 864 F.2d 1064, 1069 (3d Cir.1988). In addition, the right to counsel includes the right to "secure counsel of his own choice." Powell v. Alabama, 287 U.S. 45, 53 (1932). Notwithstanding, the Sixth Amendment does not guarantee criminal defendants an absolute right to counsel of their choice. Wheat v. United States, 486 U.S. 153, 159 (1988); Morris v. Slappy, 461 U.S. 1, 13-14 (1983); United States v. Kikumura, 947 F.2d 72, 78 (3d Cir. 1991).

---

1 *See* Chapman v. California, 386 U.S. 18 (1967); Powell v. Alabama, 372 U.S. 335 (1963).

Moreover, not every conflict or disagreement between the defendant and counsel implicates Sixth Amendment rights.  Schell v. Witek, 218 F.3d 1017, 1027 (9th Cir.2000) (*en banc*).  A violation occurs only when the conflict between counsel and client "was so great that it resulted in a total lack of communication preventing an adequate defense." *Id*. at 1024-25.  Thus, the existence of a conflict does not alone entitle a defendant to substitute counsel.  While indigent defendants are entitled to "competent representation," they do not have a right to "a meaningful relationship" with appointed counsel. *Id*. at 1026 (citing Morris v. Slappy, 461 U.S. 1, 13-14 (1983)).  Therefore, a personality conflict or a disagreement about trial strategy does not result in the abridgement of the right to effective counsel. *Id*. at 1027. Significantly, a conflict of the defendant's own making does not constitute a constructive denial of his Sixth Amendment rights.  *Id*. at 1026-27 (court may be required to determine whether the defendant himself has "sabotaged the [attorney-client] relationship or failed to make reasonable efforts on his end to develop the relationship").

> [Petitioner] has cited no Supreme Court case- and we are not aware of any that stands for the proposition that the Sixth Amendment is violated when a defendant is represented by a lawyer free of actual conflicts of interest, but with whom the defendant refuses to cooperate because of dislike or distrust. Indeed, Morris v. Slappy is to the contrary.

Plumlee v. Masto, 512 F.3d 1204, 1211 (9th Cir. 2008) (*en banc*).

A criminal defendant is entitled to counsel who functions in the active role of an advocate.  Entsminger v. Iowa, 386 U.S. 748, 751 (1967).  Thus, while an indigent criminal defendant has a right to be represented by counsel, he does not have a "right to have a particular attorney represent him and therefore must demonstrate 'good cause' to warrant substitution of counsel." United States v. Iles, 906 F.2d 1122, 1130 (6th Cir.1990).  Good cause for the substitution

of counsel is defined as a "conflict of interest, a complete breakdown of communication, or an irreconcilable conflict with the attorney." United States v. Goldberg, 67 F.3d 1092, 1098 (3d Cir.1995).  Mere dissatisfaction with counsel does not constitute good cause.  In addition to considering whether there is good cause, trial courts must also consider the efficient administration of justice and guard against manipulation and delay.  Goldberg, 67 F.3d at 1098. "If the district court denies the request to substitute counsel and the defendant ... proceeds with unwanted counsel, we will not find a Sixth Amendment violation unless the district court's 'good cause' determination was clearly erroneous or the district court made no inquiry into the reasons for the defendant's request to substitute counsel." Id.

Petitioner argues that the trial court denied his Sixth Amendment right to counsel in denying his motion to substitute counsel.  The issue before this Court is whether the conflict between DeSavage and his attorney was so great that it resulted in a total lack of communication preventing an adequate defense.  In its review of this claim, the PCRA Court made the following findings.

> At the time of the hearing on DeSavage's post-conviction relief petition, DeSavage attempted to demonstrate that there was an irreconcilable breakdown of the attorney-client relationship between he and his trial counsel, John Knorr.  Both Mr. Knorr and Mr. Farrell were called to testify as to the relationship that existed between Mr. Knorr and DeSavage and, in addition, DeSavage presented several letters and other documents which he indicated demonstrated an animus between he and his counsel.  When these claims are reviewed against the factual background of DeSavage's case and testimony of Mr. Knorr and the exhibits presented by DeSavage, it is clear that DeSavage's has failed to meet his burden of proving that counsel was ineffective.

. . .

11

The record in the instant case reveals that John Knorr, Esquire, was appointed to represent DeSavage in connection with these charges based upon Mr. Knorr's extensive experience in representing difficult criminal defendants. This was particularly important in light of the extremely serious nature of the charges and the gruesome fact pattern that existed with respect to this case. Underscoring the difficulty between Mr. Knorr and DeSavage were the documents that DeSavage offered as evidence, in particular the letters that Mr. Knorr sent to DeSavage indicating that he did not believe that DeSavage was providing him with truthful information with respect to the events of May 8 and 9, 1998. During the course of Mr. Knorr's testimony, he indicated that he believed that the attorney-client relationship with DeSavage was strained but not irreversibly broken so as to necessitate the appointment of new counsel. This strain resulted from the fact that Mr. Knorr did not believe some of the things that DeSavage was telling him in light of previous statements that DeSavage made to him. In particular, Mr. Knorr did not believe that consensual sex had taken place between DeSavage and the victim in light of DeSavage's earlier statements and the discovery material provided to him by the Commonwealth.

In that discovery material Mr. Knorr received statements from the victim, Cathleen Gubash, Kimberly Gubash, April DeSavage, George DeSavage, James DeSavage and Jeffrey DeSchon, all of whom testified at trial as to the statements that DeSavage and his co-defendant, Dale Holmes, made with respect to their involvement in the sexual assault and attempted murder of the victim. In addition to these statements, Mr. Knorr was also provided with the taped confession of the co-defendant with respect to his involvement in these crimes. The suggestion that DeSavage had consensual sex with the victim is totally inconsistent with the victim's testimony, the testimony of the Commonwealth witnesses and the physical facts presented in this case. DeSavage's statements to his cousins and their friends at the time that he awoke in the early hours of May 9, 1998, also

underscore the ludicrous nature of his assertion that he had consensual sex with the victim.

. . .

In the letter sent by Mr. Knorr to DeSavage and his notations on those letters, it is clear that DeSavage's prime goal was to shift responsibility for these offenses to his co-defendant and to attempt to portray himself as a victim of some conspiracy between the victim and his relatives. While it is true that DeSavage requested that new counsel be appointed for him, he did so without providing any reason nor did his trial counsel request that he be permitted to withdraw as counsel despite the fact that he believed there was a strained attorney-client relationship. Despite the tension that existed between DeSavage and his counsel, Mr. Knorr firmly believed that he had the ability to present a vigorous defense and did so attempting to attack the credibility of the victim with respect to her level of intoxication and also to portray the co-defendant as more than a bystander in these crimes. Although DeSavage has suggested that his counsel was ineffective for not seeking to withdraw as counsel, DeSavage has failed to meet his burden of proof that that purported ineffectiveness prejudiced him to the extent that had he withdrawn the outcome of DeSavage's case would have been different. The facts in this case as set forward in the confession of the co-defendant, the testimony of the witnesses to whom DeSavage made incriminating and inculpatory statements, together with the medical and scientific evidence, led to the inescapable conclusion that DeSavage committed these crimes and that he did not have consensual sex with the victim not she did voluntarily jump off of the McKees Rocks Bridge.

PCRA Court Opinion, 1/23/07 (doc. no. 17-5, pp 10-14).

The Superior Court affirmed this holding as follows.

The PCRA Court held three days of evidentiary hearings on DeSavage's petition. At these

13

> hearings, DeSavage and both of his prior counsel, John Knorr, Esquire (who represented him at trial) and Thomas Farrell, Esquire (who represented him on direct appeal), testified. The PCRA court concluded that although the relationship between DeSavage and Knorr was strained to some degree, the attorney-client relationship was not so irretrievably broken that Knorr could not continue representing DeSavage through trial. (PCRA Court Opinion, 1/23/07, at 3, 7). Despite his disagreement with DeSavage over strategy, Knorr testified that he still believed he could remain a zealous advocate for his client and present the best possible defense. As the PCRA court observed, Knorr did present a vigorous defense by attacking the victim's credibility based upon her alcohol consumption and portraying co-defendant Holmes as a more active participant in the crimes. (Id. at 7). We agree with the PCRA court that DeSavage's underlying claim lacks merit.

Superior Court Memorandum Opinion, 9/11/07 (doc. no. 17-5, pp. 64-65).

Petitioner has not shown that the state court decisions are not clearly contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States. Furthermore, he has not shown that the state court determinations are based on an unreasonable determination of the facts presented in the PCRA proceedings. Thus, Petitioner has not shown that he is entitled to relief under 28 U.S.C. § 2254(d)(1) and (2).

### E. Ineffective Assistance of Counsel

Petitioner next claims that his trial counsel rendered ineffective assistance in violation of his Sixth Amendment rights. The Sixth Amendment right to counsel exists "in order to protect the fundamental right to a fair trial." Lockhart v. Fretwell, 506 U.S. 364, 368 (1993) (quoting Strickland v. Washington, 466 U.S. 668, 684 (1984)). *See also* Kimmelman v. Morrison, 477 U.S. 365, 374 (1986) (the essence of a claim alleging ineffective assistance is whether counsel's

unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect).

The Supreme Court has formulated a two-part test for determining whether counsel rendered constitutionally ineffective assistance:  1) counsel's performance was unreasonable; and 2) counsel's unreasonable performance actually prejudiced the defense.  Strickland, 466 U.S. at 687. The first prong of the Strickland test requires a defendant to establish that his attorney's representation fell below an objective standard of reasonableness by committing errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment.  Strickland, 466 U.S. at 688.  The second prong requires a defendant to demonstrate that counsel's errors deprived him of a fair trial and the result was unfair or unreliable.  Strickland, 466 U.S. at 689.  A defendant is not entitled to relief unless he makes both showings.  Id. at 687.  The Strickland standard applies equally to appellate counsel.  Smith v Robbins, 528 U.S. 259, 285 (2002).

In analyzing Petitioner's claims under the two-part test announced in Strickland, this Court must apply the standards set forth in section 2254(e) concerning the presumption of correctness applicable to state court factual findings.  The question of effectiveness of counsel under Strickland is a mixed question of law and fact; it requires the application of a legal standard to the historical, fact determinations.  Berryman, 100 F.3d at 1095.  In this regard, a state court's finding that counsel had a trial strategy is a finding of fact to which the presumption applies.  Id.  Likewise, a state court's determination that a decision was a tactical one is a question of fact.  Id.

Finally, In Strickland, the Supreme Court stated that "[j]udicial scrutiny of a counsel's performance must be highly deferential" and that "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and

to evaluate the conduct from counsel's perspective at the time." 466 U.S., at 689.  Thus, even when a court is presented with an ineffective-assistance claim not subject to § 2254(d)(1) deference, a defendant must overcome the "presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Id.*

### 1.    Failing to Withdraw as Counsel

Petitioner's first ineffective claim asserts that his trial counsel was ineffective for failing to withdraw.  As set forth above, the state courts ruled that the trial court did not commit any error in denying Petitioner's motion for substitute counsel.  Moreover, the state courts ruled that Petitioner had not shown any prejudice that resulted therefrom.  During the PCRA proceeding, trial counsel Knorr testified that he still believed he remained a zealous advocate for his client and presented the best possible defense. As the PCRA court observed, Knorr did present a vigorous defense by attacking the victim's credibility based upon her alcohol consumption and portraying co-defendant Holmes as a more active participant in the crimes.  The Superior Court agreed with these findings.  Petitioner has not set forth any evidence, let alone clear and convincing evidence, to rebut these findings, which are supported by the record evidence. The state courts determinations that trial counsel is not ineffective was not contrary to, or an objectively unreasonable application of, federal law as determined by the Supreme Court of the United States.  Consequently, Petitioner is not entitled to habeas relief as to this claim.

### 2.    Failure to Sever

Petitioner next claims that trial counsel rendered ineffective assistance for failing to sever his trial from that of his co-defendant Holmes.  The Supreme Court has instructed that there is a preference in the federal system for joint trials of defendants who are indicted together as it

promotes efficiency and serves the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.  Zafiro v. United States, 506 U.S. 534, 537 (U.S. 1993).  Thus, improper joinder does not, in itself, violate the Constitution.  Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial.  United States v. Lane, 474 U.S. 438, 446 n. 8 (1986).  With respect to joinder of defendants, the Supreme Court further has instructed:

> We believe that, when defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.  Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant.  For example, evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty.  When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened.  Evidence that is probative of a defendant's guilt but technically admissible only against a codefendant also might present a risk of prejudice.  Conversely, a defendant might suffer prejudice if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial.  The risk of prejudice will vary with the facts in each case, and district courts may find prejudice in situations not discussed here.  When the risk of prejudice is high, a district court is more likely to determine that separate trials are necessary, but, . . . less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice.

Zafiro, 506 U.S. at 539 (internal citations omitted).

Both the PCRA court and Superior Court agreed that trial counsel had a reasonable basis for not requesting a severance.  Specifically, the PCRA court concluded that trial counsel had a reasonable, strategic basis for not requesting severance in that he believed that Judge Cashman, as the trier of fact, was able to consider the testimony of each defendant separately and would not be bothered by the assertion of potentially antagonistic defenses (doc. no. 17-5, pp. 14-16, doc. no. 17-5, p. 66).  In addition, the Courts found that it was reasonable for Knorr to want Holmes in the courtroom because it might lead the trier of fact to determine that his client was not the worst person in the courtroom and to possibly attribute some of the culpability to Holmes.  Moreover, both courts held that Petitioner had not shown any prejudice resulting from his counsel's failure to sever as he did not demonstrate that having his own trial would have resulted in different verdicts than the ones rendered.  Petitioner has failed to demonstrate that the Pennsylvania Courts' decisions are contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States.  Consequently, Petitioner is not entitled to relief with respect to this claim.

### F. Sentencing

Petitioner's last claim challenges the length of his sentence.  Petitioner is not entitled to habeas corpus relief with respect to this claim as he has failed to allege the denial of any federal constitutional right.  In this regard, a state prisoner may seek federal habeas corpus relief only if he is in custody in violation of the Constitution or federal law.  Smith v. Phillips, 455 U.S. 209 (1982); Geschwendt v. Ryan, 967 F.2d 877 (3d Cir.), *cert. denied*, 506 U.S. 977 (1992); Zettlemoyer v. Fulcomer, 923 F.2d 284 (3d Cir.), *cert. denied*, 502 U.S. 902 (1991).  Thus, a writ of habeas corpus is available under 28 U.S.C. § 2254(a) only on the basis of some transgression of federal law binding

on the state courts.  Engle v. Isaac, 456 U.S. 107, 119 (1982).  Violations of state law or procedural rules alone are not a sufficient basis for providing federal habeas corpus relief.  *Id*.  Thus, a writ of habeas corpus is not available when a state prisoner merely alleges that something in the state proceedings was contrary to general notions of fairness or violated some federal procedural right unless the Constitution or other federal law specifically protects against the alleged unfairness or guarantees the procedural right in the state courts.

Generally, sentencing is a matter of state criminal procedure and does not fall within the purview of federal habeas corpus.  Wooten v. Bomar, 361 U.S. 888 (1959).  As such, a federal court normally will not review a state sentencing determination that falls within the statutory limit, Williams v. Duckworth, 738 F.2d 828, 831 (7th Cir. 1984), as the severity of a sentence alone does not provide a basis for habeas relief.  Smith v. Wainwright, 664 F.2d 1194 (11th Cir. 1981) (holding that a sentence imposed within the statutory limits can not be attacked in habeas proceeding). *Accord* Gleason v. Welborn, 42 F.3d 1107, 1112 (7th Cir. 1994) (internal citation omitted), *cert. denied*, 514 U.S. 1109 (1995); Walker v. Endell, 850 F.2d 470, 476 (9th Cir. 1987), *cert. denied*, 488 U.S. 926 (1988); Mira v. Marshall, 806 F.2d 636, 639 (6th Cir. 1986); United States v. Myers, 374 F.2d 707 (3d Cir. 1967).[2]  Thus, unless an issue of constitutional dimension is implicated in a sentencing argument, this Court is without power to grant habeas relief.  United States v. Addonizio, 442 U.S. 178, 186 (1979) (noting that a criminal sentence was not subject to collateral attack unless the sentencing court lacked jurisdiction to impose it or committed a constitutional error that made the sentence or underlying conviction fundamentally unfair).

---

[2] *See also* Medina v. Artuz, 872 F. Supp. 1258 (S.D.N.Y. 1995) (no showing that the sentence was grossly inappropriate to the crime so as to present a federal constitutional question).

A sentence violates the Eighth Amendment of the Constitution only when it is extreme and "grossly disproportionate to the crime."  Harmelin v. Michigan, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring) ("The Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are grossly disproportionate to the crime.") (citation omitted).  Moreover, it is firmly established that mere discrepancy in the sentences imposed upon two similarly-situated individuals does not constitute a violation of equal protection.  Dorszynski v. United States, 418 U.S. 424 (1974); United States v. Palma, 760 F.2d 475 (3d Cir. 1985).

In the case at bar, Petitioner does not allege that the sentencing court lacked jurisdiction or committed a constitutional error making the sentence fundamentally unfair.  Instead, he complains that the judge was biased against him and, therefore, imposed his sentences to run consecutively to, in effect, give him a life sentence.  However, because the imposition of consecutive sentences in Pennsylvania is within the sound discretion of the court,[3] Petitioner's claim does not raise any constitutional question.  See, e.g., Souch v. Schaivo, 289 F.3d 616 (9th Cir. 2002) (holding that neither an alleged abuse of discretion by the trial court in choosing consecutive sentences, nor the trial court's alleged failure to list its reasons for imposing consecutive sentences, being errors under state law, could form the basis for federal habeas relief); Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir.1994) (concluding, where Nevada prisoner challenged state trial court imposition of consecutive sentences without explanation, "[t]he decision whether to impose sentences

---

[3] See Commonwealth v. Burkhardt, 526 Pa. 341, 586 A.2d 375 (1991); Commonwealth v. Hoag, 445 Pa. Super. 455, 665 A.2d 1212 (1995) (generally, in imposing a sentence, court has discretion to determine whether to make it concurrent with or consecutive to other sentences then being imposed or other sentences previously imposed).

concurrently or consecutively is a matter of state criminal procedure and is not within the purview of federal habeas corpus"); Herrera v. Artuz, 171 F.Supp.2d 146 (S.D.N.Y. 2001) (holding that state court's decision to impose consecutive sentences did not warrant federal habeas relief, even where prosecution had recommended concurrent sentences, where sentence was within the range prescribed by state statute and the trial court had discretion to impose consecutive terms).[4]

Pennsylvania's statutory sentencing scheme is indeterminate, advisory, and guided. In imposing a sentence, the judge is directed to give two numbers representing the minimum and maximum period of incarceration. 42 Pa.C.S. § 9756(a), (b). In no circumstance may the sentence imposed go beyond the statutory maximum sentence. Here, Petitioner does not allege that he was sentenced beyond the statutory maximum. Consequently, he has failed to show that he is entitled to habeas corpus relief with respect to his sentencing claim. An appropriate order follows.

### G. Certificate of Appealability

Section 2253 generally governs appeals from district court orders regarding habeas petitions. Section 2253(c)(1)(A) provides that an appeal may not be taken from a final order in a habeas proceeding in which the detention arises out of process issued by a State court unless a certificate of appealability has been issued. A certificate of appealability should be issued only when a petitioner has made a substantial showing of a denial of a constitutional right. 28 U.S.C. § 2254(c)(2). Here, the record fails to show a violation of Petitioner's constitutional rights. Accordingly, a certificate of appealability should be denied.

**AND NOW**, this 27th day of January, 2010;

---

4  Moreover, where the court has discretion to impose concurrent sentences, the failure to warn of its possible imposition does not render a guilty plea involuntary. United States v. Kikuyama, 109 F.3d 536 (9th Cir. 1997); Barbee v. Ruth, 678 F.2d 634, 635 (5th Cir. 1982).

**IT IS HEREBY ORDERED** that Petitioner's Petition is **DENIED.**

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED**.

**IT IS FURTHER ORDERED** that the Clerk of Court mark this case **CLOSED**.

**AND IT IS FURTHER ORDERED** that pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, Petitioner has thirty (30) days to file a notice of appeal as provided by Rule 3 of the Federal Rules of Appellate Procedure.

_____
Lisa Pupo Lenihan
United States Magistrate Judge

cc:     CHRISTOPHER J. DESAVAGE, DW5297
        SCI Huntingdon
        1100 Pike St.
        Huntingdon, PA 16654